## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEPHENS COUNTY HOSPITAL,<br><br>   *Plaintiff*,<br><br>  v.<br><br>XAVIER BECERRA,[1] Secretary, U.S.<br>Department of Health and Human Services,<br><br>   *Defendant*. | No. 19-cv-3020 (DLF)<br>No. 19-cv-3022 (DLF) |
| HALIFAX REGIONAL MEDICAL<br>CENTER,<br><br>   *Plaintiff*,<br><br>  v.<br><br>XAVIER BECERRA,[1] Secretary, U.S.<br>Department of Health and Human Services,<br><br>   *Defendant*. | No. 20-cv-836 (DLF)<br>No. 20-cv-838 (DLF) |

## <u>MEMORANDUM OPINION</u>

The U.S. Department of Health and Human Services reimburses certain rural hospitals

for their fixed costs during years when they experience sudden decreases in patient discharges.

This payment is called a "volume decrease adjustment" ("VDA").  In these consolidated cases,

plaintiffs Stephens County Hospital ("Stephens County") and Halifax Regional Medical Center

("Halifax") challenge the Department Secretary's calculation of their VDA payments for fiscal

---

[1] When these suits began, Alex Azar was the Secretary of the Department of Health and Human Services.  When Xavier Becerra became Secretary, he was automatically substituted as the proper defendant.  *See* Fed. R. Civ. P. 25(d).

years 2008, 2012, and 2013.  Before the Court are the plaintiffs' Motion for Summary Judgment,

Dkt. 26, and the Secretary's Cross-Motion for Summary Judgment, Dkt. 27.  For the reasons that

follow, the Court will deny the plaintiffs' motion and grant the Secretary's motion.

## I.   BACKGROUND

### A.   Statutory and Regulatory Background

#### 1.   *Medicare Prospective Payment System*

The Medicare Act establishes a federally-funded health insurance program for the elderly

and disabled.  *See* 42 U.S.C. § 1395 *et seq.*  Medicare is administered by the Centers for

Medicare and Medicaid Services ("CMS"), "a division of the Department of Health and Human

Services, under the executive management of the Secretary."  *Anna Jacques Hosp. v. Burwell*,

797 F.3d 1155, 1157 (D.C. Cir. 2015).  Under this "complex statutory and regulatory regime,"

*Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 404 (1993), the government pays participating

hospitals for certain costs that they incur in treating Medicare beneficiaries.  *Methodist Hosp. v.

Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994).

CMS contracts with Medicare Administrative Contractors to administer this payment

process.  42 U.S.C. § 1395h; *Gentiva Health Servs. v. Cochran*, No. 19-2271, 2021 WL 827193,

at *2 (D.D.C. March 3, 2021).  A provider may appeal to the Provider Reimbursement Review

Board ("Board") to challenge its reimbursement payment.  42 U.S.C. § 1395oo(a).  The Board's

decision is final unless the Secretary, acting through the CMS Administrator, "reverses, affirms,

or modifies" the Board.  *Id.* § 1395oo(f)(1); 42 C.F.R. § 405.1875.  Then, a provider may

challenge a final decision by the Board or the Administrator in federal district court.  42 U.S.C.

§ 1395oo(f)(1); 42 C.F.R. § 405.1877.

Initially, participants were reimbursed for the actual costs that they incurred, so long as the claimed costs were deemed reasonable. *Anna Jacques Hosp.*, 797 F.3d at 1157.  In 1983, concerned that this system provided hospitals with "little incentive . . . to keep costs down," Congress implemented the Inpatient Prospective Payment System to reimburse hospitals at "prospectively fixed rates."  *Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1008 (D.C. Cir. 1999) (quotation omitted).  Prospective payments are based on the "federal rate," a standard nationwide rate derived from the average operating costs of inpatient hospital services. *Id.* (citing 42 U.S.C. § 1395ww(d)(2)(A)–(B)).  This rate is adjusted by a wage index that accounts for regional differences in labor costs. *Id.* at 1008–09 (citing 42 U.S.C. § 1395ww(d)(2)(H), (d)(3)(E)).  The adjusted rate is then multiplied by "an additional weighting factor that reflects the disparate hospital resources required to treat major and minor illnesses." *Id.* at 1008.  This weighting factor is called a "diagnosis-related group" ("DRG").

Accordingly, under the prospective payment system, "providers are reimbursed a fixed amount for each discharge, based on the patient's diagnosis, and *regardless of actual cost*." *Good Samaritan Hosp.*, 508 U.S. at 406 n.3 (citing 42 U.S.C. § 1395ww(d)) (emphasis added).  Hospitals that "treat patients for less than the DRG amount get 'rewarded,' while hospitals that spend more than the DRG amount must absorb the excess costs." *Cmty. Hosp. of Chandler, Inc. v. Sullivan*, 963 F.2d 1206, 1207–08 (9th Cir. 1992).

Certain hospitals—"sole community hospital[s] ("SCHs")," 42 U.S.C. § 1395ww(d)(5)(D),[2] and "Medicare-dependent, small rural hospital[s] ("MDHs")," *id.*

---

[2] A "sole community hospital" is defined to include any hospital that "the Secretary determines is located more than 35 road miles from another hospital," that is "the sole source of inpatient hospital services reasonably available to [Medicare beneficiaries] in a geographic area," or "that is located in a rural area and designated by the Secretary as an essential access community hospital."  42 U.S.C. § 1395ww(d)(5)(D)(iii).

§ 1395ww(d)(5)(G)[3]—are subject to an alternative reimbursement scheme.  When an SCH or an

MDH discharges a Medicare patient, it "receives reimbursement based on either the standard

federal rate or a hospital-specific rate derived from its actual costs of treatment in one of the base

years specified in the statute, whichever is higher."  *Adirondack Med. Ctr. v. Burwell*, 782 F.3d

707, 709 (D.C. Cir. 2015).

> ### 2.      *Volume Decrease Adjustment*

Sole community and Medicare dependent hospitals are also entitled to VDA payments to

support them during periods of sudden declines in patient volume.  They are eligible for this

adjustment in a cost-reporting period in which the hospital experiences "a decrease of more than

5 percent in its total number of inpatient cases due to circumstances beyond its control."  42

U.S.C. § 1395ww(d)(5)(D)(ii) (SCHs); *id.* § 1395(d)(5)(G)(iii) (MDHs).  In that case, "the

Secretary shall provide for such adjustment . . . as may be necessary to fully compensate the

hospital for the *fixed* costs it incurs in the period in providing inpatient hospital services,

including the reasonable cost of maintaining necessary core staff and services."  *Id.* (emphasis

added).  To qualify, an SCH or MDH must submit documentation to the Medicare contractor

"demonstrating the size of the decrease in discharges, and the resulting effect on per discharge

costs" and to "[s]how that the decrease is due to circumstances beyond the hospital's control."

42 C.F.R. § 412.92(e)(2) (SCHs); *id.* § 412.108(d)(2) (MDHs).

The Medicare Act does not explain how to calculate the VDA.  Instead, the Secretary has

provided such explanation through informal rulemaking and interpretive guidance.  In 1983, the

---

[3] A "Medicare-dependent, small rural hospital" is defined to include any hospital that "is located
in a rural area," that "has not more than 100 beds," that "is not classified as a sole community
hospital," and that has a high percentage of Medicare discharges.  42 U.S.C.
§ 1395ww(d)(5)(G)(iv).

Secretary promulgated a rule to provide that the VDA amount shall be based on the hospital's "needs and circumstances," its "fixed and semi-fixed costs," and "the length of time the hospital has experienced a decrease in utilization."  42 C.F.R. § 405.476(d) (1984).  "Fixed costs" are "those over which management has no control . . . such as rent, interest, and depreciation."  *See* Prospective Payments for Medicare Inpatient Hospital Services, 48 Fed. Reg. 39,752, 39,781 (Sept. 1, 1983).  "Variable costs"—which were *not* eligible for reimbursement—are "those costs for items and services that vary directly with utilization," like "food and laundry services."  *Id.* at 39,781–82.  And some costs may be "essential for the hospital to maintain operation but will also vary with volume."  *Id.* at 39,781.  These "[s]emi-fixed costs," such as "personnel related costs," may be considered fixed for reimbursement purposes on a "case by case basis."  *Id.* at 39,781– 82.

In 1987, the Department, concerned that hospitals received VDAs even though their prospective payments (*i.e.*, DRG revenue) *exceeded* their inpatient operating costs for a given year, amended its regulations.  *See* Changes to the Inpatient Hospital Prospective Payment System and Fiscal Year 1988 Rates, 52 Fed. Reg. 33,034, 33,049 (Sept. 1, 1987).  In that scenario, "no further adjustment should be granted."  *Id.*  Accordingly, the amended regulation— in effect during the relevant time period for this litigation—states that the contractor will "determine[] a lump sum adjustment amount *not to exceed* the difference between the hospital's Medicare inpatient operating costs and the hospital's total DRG revenue for inpatient operating costs based on DRG-adjusted prospective payment rates for inpatient operating costs."  42 C.F.R. § 412.92(e)(3) (emphasis added); *see also id.* § 412.108(d)(3).  Then, to decide the specific adjustment amount, the contractor is directed to "consider[]" the hospital's "needs and

circumstances," its "fixed and semi-fixed costs," and "the length of time the hospital has experienced a decrease in utilization." *Id.* §§ 412.92(e)(3)(i), 412.108(d)(3)(i).

The Department addressed the VDA calculation in the preamble to the final rule setting prospective payment rates for fiscal year 2007. *See* Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2007 Rates, 71 Fed. Reg. 47,870, 48,056 (Aug. 18, 2006). The VDA, it reiterated, is meant to "compensate an SCH or MDH for the fixed costs it incurs in the year following the reduction in discharges." *Id.* It also clarified that "not all staff costs can be considered fixed costs." *Id.* As a general matter, the Secretary will treat personnel costs as fixed when hospital has experienced a short decrease in utilization. *See* 48 Fed. Reg. 39,752, 39,782. In contrast, when such a decrease continues, the Secretary expects that "a cost-effective hospital would take some action to reduce unnecessary expenses." *Id.* So to determine the VDA, the contractor must "subtract[] the second year's DRG [revenue] from the lesser of: (a) The second year's costs minus any adjustment for excess staff; or (b) the previous year's costs multiplied by the appropriate [prospective payment] update factor minus any adjustment for excess staff." 71 Fed. Reg. 47,870, 48,056. The hospital receives the difference. *Id.*

The Department noted that this formula is found in section 2810.1 of the Medicare Provider Reimbursement Manual ("Manual"), an agency guidance document. *Id.* Indeed, the Manual includes sample VDA calculations. PRM 15-1, § 2810.1(D); Administrative Record (AR) 119–21, Dkt. 34. "Hospital C," for instance, had a lower inpatient operating cost in fiscal year 1987 than it did in fiscal year 1986 (increased by the prospective payment update factor). *Id.* Thus, to determine its VDA for fiscal year 1987, its 1987 DRG revenue was subtracted from a line-item labeled "1987 Program Inpatient Operating Cost." *Id.* The Manual does not list which costs are included in the "inpatient operating cost" for the relevant fiscal year. In a

separate section, however, it explains that some semi-fixed costs—if the hospital has not taken appropriate steps to reduce them—"may not be included in determining the amount of the payment adjustments."  PRM 15-1, § 2810.1(B); AR 115.

### 3.    2017 Final Rule

In April 2017, the agency issued a notice of proposed rulemaking about changes to the VDA calculation method.  *See* Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and Proposed Policy Changes and Fiscal Year 2018 Rates, 82 Fed. Reg. 19,796, 19,933–35 (Apr. 28, 2017).  It noted some hospitals' concerns with the then-current formula.  Under that method, the Medicare contractors subtract "the hospital's total [DRG] revenue for inpatient operating costs . . . from fixed costs in the cost reporting period in which the volume decrease occurred, minus any adjustment for excess staff."  *Id.* at 19,934.[4]  If the result is zero or less than zero, the hospital does not receive a VDA.  To some providers, this was problematic: the DRG revenue, though not based on a hospital's *actual* costs, is meant to compensate it for "treating Medicare beneficiaries for which it incurs inpatient operating costs (consisting of fixed, semi-fixed, and variable costs)."  *Id.*  And because the DRG revenue includes variable costs, the subtraction of that amount from a hospital's fixed costs may fail to "fully compensate the hospital for the fixed costs it incurs."  42 U.S.C. § 1395ww(d)(5)(D)(ii); *id.* § 1395(d)(5)(G)(iii).  To that end, in a series of decisions, the

---

[4] The Board and/or the CMS Administrator endorsed this method in a series of adjudications. *See, e.g.*, *Greenwood Cnty. Hosp. v. Blue Cross Blue Shield Ass'n*, 2006 WL 3050893 (PRRB Aug. 29, 2006); *Unity Healthcare v. Blue Cross Blue Shield Ass'n*, 2014 WL 5450066 (CMS Admin. Sept. 4, 2014); *Lakes Regional Healthcare v. Blue Cross Blue Shield Ass'n*, 2014 WL 5450078 (CMS Admin. Sept. 4, 2014); *Fairbanks Mem'l Hosp. v. Wisc. Physician Servs.*, 2015 WL 5852432 (CMS Admin. Aug. 5, 2015); *St. Anthony Reg'l Hosp. v. Wisc. Physicians Servs.*, 2016 WL 7744992 (CMS Admin. Oct. 3, 2016); *Trinity Reg'l Med. Ctr. v. Wisc. Physicians Servs.*, 2017 WL 2403399 (CMS Admin. Feb. 9, 2017).

Board had explained that contractors should adjust the hospital's total DRG revenue "by looking at the ratio of a hospital's fixed costs to its total costs . . . and applying that ratio as a proxy for the share of the hospital's [DRG] payments that it assumes are attributable (or allocable) to fixed costs, and then comparing that estimate of the fixed portion of [DRG] payments to the hospital's fixed costs."  82 Fed. Reg. 19,796, 19,934.

The Department, still maintaining the current formula's reasonableness and consistency with the statute, proposed to change the regulation accordingly.  82 Fed. Reg. 19,796, 19,934. The revised regulation would require contractors to multiply the hospital's total DRG revenue by the ratio of its fixed to total costs before subtracting that revenue from the hospital's total fixed costs.  Doing so would squarely compare fixed costs to fixed costs and so "remove any *conceivable possibility* that a hospital that qualifies for the volume decrease adjustment could ever be less than fully compensated for fixed costs."  *Id.* (emphasis added).  In August 2017, the Department issued a final rule adopting the new formula.  *See* Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and Proposed Policy Changes and Fiscal Year 2018 Rates, 82 Fed. Reg. 37,990, 38,180–83 (Aug. 14, 2017).  Adhering to its typical practice, the Department decided the regulation would apply prospectively for cost periods beginning on or after October 1, 2017.  *Id.* at 38,182.

### B.    Factual and Procedural History

#### 1.    Stephens County

Stephens County is an acute care hospital in Toccoa, Georgia that qualified as an MDH during fiscal years 2008 and 2012.  AR 1547, 2296.  After experiencing a decline in inpatient discharges during those years, it submitted timely requests for VDA payments.  AR 2276.

Subtracting its DRG revenue from its *total* operating costs, it asked for $3,213,608 for 2008 and $1,806,332 for 2012.  AR 1539, 2288.[5]  The Medicare contractor used a different formula: First, it calculated the hospital's fixed costs for the relevant fiscal years by subtracting its variable costs from its total operating costs.  Then, it subtracted the DRG revenue from the fixed costs. AR 1556, 2305.  It concluded that Stephens County was entitled to a $1,129,88 VDA payment for 2008.  AR 1556.  But because the hospital's DRG revenue exceeded its fixed costs in 2012, the contractor determined that it should not receive a VDA payment for that year.  AR 2305.

Stephens County appealed to the Board.  After holding a hearing in January 2019, the Board reversed the contractor by decisions dated July 25, 2019.  *See* AR 1669, 2432.  It found that the contractor's method was "not a reasonable interpretation of the statute."  AR 1678, 2441. But it did not endorse Stephens County's proposed calculation.  Rather, it employed the proportional approach that the Department adopted on a prospective basis in its 2017 rulemaking.  Thus, although the Board "[did] not have the . . . actuarial data to determine a split between fixed and variable costs related to a DRG payment," it used the contractor's "fixed/variable cost percentages [for the fiscal year at issue] as a proxy."  AR 1679, 2441.  It accordingly determined that the hospital should receive a $2,794,536 VDA for 2008, and a $1,461,600 VDA for 2012.  AR 1679, 2442.

On September 26, 2019, the Administrator reversed the Board and reinstated the contractor's initial VDA decisions for both fiscal years.  AR 1537–57, 2286–306.  Based on "the relevant statute and regulation" and past agency decisions, the Administrator held that the

---

[5] Because its operating costs in 2008 were higher than they were in the previous year (multiplied by the prospective payment update factor), Stephens County subtracted its 2008 DRG revenue from its 2007 total operating costs.  *See* AR 1672.

contractor properly excluded the hospital's variable costs from the calculations.  AR 1554–55, 2303–04.

        2.    *Halifax*

Halifax is a non-profit acute care hospital in Roanoke Rapids, North Carolina that qualified as an SCH during fiscal years 2012 and 2013.  AR 8, 784.  It experienced a decline in patient discharges during those years, so it requested a VDA.  It proposed to subtract its DRG revenue from its total operating costs, and then multiply the result by its fixed cost ratio for the fiscal year at issue.  *See* AR 62, 834.  Accordingly, it asked for a VDA payment of $1,592,791 for 2012 and $475,131 for 2013.  *Id.*  As it did for Stephens County, the Medicare contractor instead subtracted Halifax's total DRG revenue from its total fixed costs.  AR 21, 794.  For both fiscal years, because the hospital's DRG revenue exceeded its fixed costs, the contractor did not award VDA payments.  *Id.*

Halifax appealed to the Board.  After holding a hearing in January 2019, the Board reversed the contractor by decisions dated January 31, 2020.  *See* AR 60, 832.  Its decisions were similar to those it reached for Stephens County.  It found the contractor's methodology unreasonable; instead, it employed the proportional approach adopted by the Department on a prospective basis.  *See, e.g.*, AR 840–41.  It determined that Halifax should receive a VDA of $1,594,735 for 2012 and $475,131 for 2013.  AR 20, 841.

On March 13, 2020, the Administrator reversed the Board, concluding that Halifax should not receive VDA payments for either year.  AR 4–23, 777–96.  It explained, as it did in the Stephens County cases, that the contractor's method was consistent with the statute, regulation, guidance, and past agency decisions.  AR 19–21, 792–94.  It also addressed Halifax's argument that the agency was bound to follow the PRM's sample calculations, which supposedly

instruct contractors to subtract the DRG revenue from the hospital's total costs.  AR 10, 783.

That interpretation, the Administrator explained, would conflict with the statute: it would ensure

not only the full compensation of the hospital's fixed costs, but also "a dollar-for-dollar

reimbursement of its *variable* costs."  AR 21, 794.  Thus, the Administrator reinstated the

contractor's initial decisions.  AR 22, 795.

> ### 3.    This suit

The plaintiffs sought judicial review of the Administrator's final decisions pursuant to 42

U.S.C. § 1395oo(f).  On October 9, 2019, Stephens County filed its initial complaint in this

Court.  *See* No. 19-cv-3020, Compl., Dkt. 1; No. 19-cv-3022, Compl., Dkt. 1.  Halifax filed its

complaint on March 27, 2020 before Judge Kelly.  *See* No. 20-cv-836, Compl., Dkt. 1; No. 20-

cv-838, Compl., Dkt. 1.  The Court granted the Secretary's Motion to Consolidate, No. 19-cv-

3020, Dkt. 22, by Minute Order dated September 30, 2020.  The plaintiffs move for summary

judgment, contending that the Secretary acted arbitrarily and capriciously by using a new

calculation method that violates the Medicare Act, VDA regulation, and agency guidance.[6]  The

Secretary cross-moves for summary judgment.  Both motions are ripe for review.

## II.    LEGAL STANDARDS

A court grants summary judgment if the moving party "shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A

"material" fact is one with potential to change the substantive outcome of the litigation.  *See*

---

[6] Stephens County renews its challenge to the timeliness of the Administrator's reversal of the Board.  *See* Pl's Mot. for Summ. J. at 40–43, Dkt. 26.  The Court rejected this argument when it denied Stephens County's Motion for Judgment on the Pleadings.  *See* No. 19-cv-3020, Order, Dkt. 20; No. 19-cv-3022, Order, Dkt. 21.  For the reasons stated in that order, the Court holds that the Administrator's decisions were timely.

*Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A

dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for

the nonmoving party.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

In an APA case, summary judgment "serves as the mechanism for deciding, as a matter

of law, whether the agency action is supported by the administrative record and otherwise

consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F.Supp.2d 76, 90

(D.D.C. 2006).  The Court will "hold unlawful and set aside" agency action that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C.

§ 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

right," *id.* § 706(2)(C), or "unsupported by substantial evidence," *id.* § 706(2)(E).

In an arbitrary and capricious challenge, the core question is whether the agency's

decision was "the product of reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*

*v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983); *see also Nat'l Telephone Co–op.*

*Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) ("The APA's arbitrary-and-capricious

standard requires that agency rules be reasonable and reasonably explained.").  The court's

review is "fundamentally deferential—especially with respect to matters relating to an agency's

areas of technical expertise."  *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (quotation marks

and alteration omitted).  The court "is not to substitute its judgment for that of the agency."  *State*

*Farm*, 463 U.S. at 43.  "Nevertheless, the agency must examine the relevant data and articulate a

satisfactory explanation for its action including a rational connection between the facts found and

the choice made."  *Id.* (internal quotation marks omitted).  When reviewing that explanation, the

court "must consider whether the decision was based on a consideration of the relevant factors

and whether there has been a clear error of judgment."  *Id.* (internal quotation mark omitted).

For example, an agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* The party challenging an agency's action as arbitrary and capricious bears the burden of proof. *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

To the extent that an agency action is based on the agency's interpretation of a statute it administers, the court's review is governed by the two-step *Chevron* doctrine. *Chevron* applies when the agency "enunciates its interpretation through notice-and-comment rule-making or formal adjudication." *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007). At Step One, a court must determine "whether Congress has directly spoken to the precise question at issue" or instead has delegated to an agency the legislative authority to "elucidate a specific provision of the statute by regulation." *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 843–44 (1984). If the latter, a court must reach Step Two, which asks whether the agency action "is based on a permissible construction of the statute" or instead is "manifestly contrary to the statute." *Id.* In addition, courts will defer to an agency's interpretation of its own regulations only if the regulation is "genuinely ambiguous," the agency's reading is "reasonable," and "the character and context of the agency interpretation entitles it to controlling weight." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–16 (2019).

## III.   ANALYSIS

According to the plaintiffs, their VDA payments must be calculated using one of two methods—either the formula found in the Manual, or the formula used by the Board. The Secretary's different method, they claim, is contrary to the applicable statute, regulation, and

interpretive guidance.  Additionally, they argue the Secretary acted arbitrarily and capriciously by adopting a new methodology. The Court takes each argument in turn.

### A.    The Secretary's Method is Consistent with the Manual

#### 1.    *Notice-and-Comment*

The Medicare Act requires the agency to provide a public notice-and-comment period for any "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under [Medicare]."  42 U.S.C. § 1395hh(a)(2).  Thus, the agency violates the Act if it departs from or creates a new "'substantive legal standard' affecting Medicare benefits," even in an interpretive rule, without giving the public notice and a chance to comment.  *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1808, 1811 (2019).  The plaintiffs contend that the Secretary's alleged departure from the Manual calculation method was a substantive change that required notice-and-comment.  But they misread the Manual and offer no support for their assertion that the Secretary's methodology changed.

The plaintiffs understand the Manual to require the contractor to subtract the DRG revenue from the hospital's total inpatient operating cost—fixed, semi-fixed, and variable.  *See* Pl's Mot. for Summ. J. at 1–2.  To be sure, the sample calculation for "Hospital C" states that its adjustment "is the entire difference between FY 1987 Program Inpatient Operating Cost and FY 1987 DRG payments."  PRM 15-1, § 2810.1(D); AR 120.  That language seemingly leaves little room for the contractor to isolate the hospital's fixed costs.  But the Manual's examples cannot be read "in isolation."  *Unity Healthcare v. Azar*, 918 F.3d 571, 578 (8th Cir. 2019).  The guidance does not claim that "FY 1987 Inpatient Operating Cost" includes *all* costs.  Perhaps the

variable costs—costs that are ineligible for reimbursement—have already been excluded.  *See*

*Unity Healthcare v. Hargan*, 289 F. Supp. 3d 985, 997 (S.D. Iowa 2018), *aff'd sub nom. Unity*

*Healthcare*, 918 F.3d at 574.

Indeed, other sections of the Manual support that interpretation.  Take the focus on semi-

fixed costs.  Contractors are instructed to consider how much time a hospital has had fewer

patients.  PRM 15-1, § 2810.1(B); AR 115.  A cost-effective hospital, faced with a lengthy

downturn, would take steps to reduce its semi-fixed costs.  *Id.*  If it has not, the contractor may

exclude those costs when determining the hospital's VDA payment.  *Id.*  The contractor could

not do so, however, if he had to subtract the DRG revenue from the hospital's *total* costs for the

relevant fiscal year.  Further, the Manual emphasizes that the adjustment is "*not to exceed* the

difference between the hospital's Medicare inpatient operating cost and the hospital's total DRG

revenue."  *Id.* (emphasis added).  If contractors calculate the VDA by subtracting the total DRG

revenue from the total inpatient operating cost, "not to exceed" should instead read "equal to."[7]

The Manual would make little sense if the plaintiffs' reading were to prevail.

So too with the formula laid out in the Department's preamble to the 2007 final rule.  *See*

71 Fed. Reg. 47,870, 48,056 (Aug. 18, 2006).  After noting that "not all staff costs can be

considered fixed costs," it explained that the DRG revenue should be subtracted from the

hospital's costs, "minus any adjustment for excess staff."  *Id.*  This implies that, by the time a

---

[7] Other interpretations can also harmonize and explain the PRM's seemingly contradictory sections.  For instance, the sample calculation could simply represent the ceiling that the VDA payment cannot exceed—the difference between a hospital's DRG revenue and its total operating costs.  *See Unity Healthcare*, 918 F.3d at 578.  Indeed, the Board once concluded that "the examples are intended to demonstrate how to calculate the adjustment limit as opposed to determining which costs should be included in the adjustment."  *Greenwood Cnty. Hosp.*, 2006 WL 3050893, at *9 n.19.  This decision was not reviewed by the Secretary, and thus constitutes final agency action.

contractor subtracts a hospital's DRG revenue from what the Manual labels its "Inpatient Operating Cost[s]," the contractor must have already excluded all variable costs from the latter. The Secretary performed that very calculation in this case.  Therefore, the method that the Secretary used to calculate the plaintiffs' VDA payments is fully consistent with the Manual.

In fact, the plaintiffs do not cite any final agency decision endorsing their alleged "[Manual] methodology." *See* Pl's Mot. for Summ. J. at 24–27.  The Secretary, by contrast, can point to numerous adjudications, dating back to 2006, that support the method employed in the plaintiffs' cases.  *See* Def's Cross-Mot. for Summ. J. at 12–13, Dkt. 27.  Thus, the Court is not persuaded that there has been a shift in agency policy requiring notice-and-comment rulemaking. *See NewLifeCare Hospitals of North Carolina, LLC v. Becerra*, 7 F.4th 1215, 1222–23 (D.C. Cir. 2021) (holding that because the hospitals "identify no change in CMS policy," the Secretary did not violate the Medicare Act by enforcing a policy without notice-and-comment); *Gentiva Health Servs.*, 2021 WL 827193, at *13 ("[T]he Court is unpersuaded that the [contractor's] approach constitutes a 'new calculation method.' ").  The plaintiffs' process challenge fails.

### 2.    *Arbitrary and Capricious Review*

The above analysis also forecloses the plaintiffs' arbitrary and capriciousness challenge. Their argument rests entirely on the premise that "HHS never addressed or explained its change from the Secretary's [Manual] Methodology, or followed an appropriate process to change its interpretation."  Pl's Mot. for Summ. J. at 37.  The plaintiffs are correct that "[f]ailing to supply . . . a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored . . . renders the agency's action arbitrary and capricious."  *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) (internal quotation omitted).  But here, the agency policy did not change.  The Secretary's calculation method was

fully consistent with past agency guidance and adjudications.  And because there was no shift in "longstanding policies," the Court cannot agree that the Secretary harmed the plaintiffs' "serious reliance interests."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (internal quotation omitted); *cf.* Pl's Mot. for Summ. J. at 37–38.

The Court thus concludes that the Secretary did not change agency policy without explanation.  Accordingly, he did not act arbitrarily and capriciously.

## B.    The Secretary's Method is Reasonable Under the Statute and Regulation

The plaintiffs also challenge the substance of the Secretary's calculation method, claiming that it violates the statutory and regulatory scheme.  The Eighth Circuit faced a nearly identical challenge in *Unity Healthcare v. Azar*, 918 F.3d 571 (2019).  It found the Secretary's method consistent with the applicable statute and regulation.  The Court agrees.

### 1.    *Chevron*

Because the Secretary's interpretation of the Medicare Act was issued via formal adjudication,[8] it should be analyzed under the *Chevron* framework, and the plaintiffs do not argue otherwise.  *Mount Royal Joint Venture*, 477 F.3d at 754; *Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658, 661 (D.C. Cir. 1994).  Indeed, courts have repeatedly held that "[t]he broad deference of *Chevron* is even more appropriate in cases that involve a 'complex and highly technical regulatory program,' such as Medicare, which 'require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns.'"  *Robert Wood Johnson Univ. Hosp. v. Thompson*, 297 F.3d 273, 282 (3d Cir. 2002) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

---

[8] The Secretary reviewed the Board's decision, which was based "upon the record made at [a] hearing."  42 U.S.C. § 1395oo(d), (f); *see* 5 U.S.C. § 554(a); *Unity Healthcare*, 918 F.3d at 577.

i.      Step One

The Court begins, as it must, with the text of the Medicare Act.  If "Congress has spoken directly to the precise question at issue," the Court "must give effect to [its] unambiguously expressed intent."  *Chevron*, 467 U.S. at 842–43.  But if the statute is "silent or ambiguous with respect to the specific issue," the Court will uphold the Secretary's "permissible construction of the statute."  *Id.* at 843.  Here, the Secretary "shall provide" SCHs or MDHs that experience a decline in patient volume "such adjustment to the payment amounts under this subsection . . . as may be necessary to fully compensate the hospital for the fixed costs it incurs in the period in providing inpatient hospital services, including the reasonable cost of maintaining necessary core staff and services."  42 U.S.C. § 1395(d)(5)(D)(ii); *id.* § 1395ww(d)(5)(G)(iii).  The provision is clear that the Secretary, through a combination of the prospective DRG payments and the VDA, must ensure that the eligible hospital receive full compensation for its *fixed costs* in the given year.

Beyond that, the Act is silent regarding the formula that the Secretary must use to provide for full compensation.  "Congress through its silence delegated [this] decision[] to the Secretary."  *Anna Jacques Hosp.*, 797 F.3d at 1164 (quoting *Methodist Hosp.*, 38 F.3d at 1230).  As such, this is "the antithesis of a *Chevron* step one statutory directive."  *Id.  See also Unity Healthcare*, 918 F.3d at 577 ("This is an instance where the Secretary was left with little or no statutory guidance.") (internal quotation omitted).

The plaintiffs resist this conclusion by pointing to other provisions in the Act.  They insist that a hospital's DRG payments are compensation for "the average costs – both fixed and variable – incurred by hospitals in treating inpatient Medicare beneficiaries."  Pl's Mot. for Summ. J. at 29 (emphasis omitted).  Therefore, they argue that the Secretary *must* utilize one of

two methods to ensure full compensation—either compare the hospital's total DRG revenue with its total operating costs or compare the fixed cost portion of the hospital's DRG revenue with its fixed costs.

The text's focus on fixed costs rules out the first interpretation.  If the VDA payment were calculated by subtracting the hospital's DRG revenue from its *total* operating costs in a given year, that hospital would be fully compensated for *all* of its costs, fixed and variable.  The provision's command to compensate the hospital for its fixed costs implies that the hospital is not entitled to compensation for its variable costs.  *See Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (quoting A. Scalia & B. Garner, *Reading Law* 107 (2012) ("The expression of one thing implies the exclusion of others")).  Indeed, the prospective payment system represents an explicit departure from the old system wherein "providers were reimbursed for the actual costs that they incurred."  *Methodist Hosp.*, 38 F.3d at 1227.  Now, to incentivize efficiency, "[w]hen a hospital's actual operating costs exceeds its federally prescribed limit for the given DRG, the hospital must absorb the difference."  *Sacred Heart Med. Ctr. v. Sullivan*, 958 F.2d 537, 541 (3d Cir. 1992).  Thus, the Act cannot be read to require that a hospital be fully compensated for all its costs.

Nor does the statutory scheme mandate the second interpretation.  True, DRG payments under the prospective payment system are meant to reimburse hospitals for their "operating costs of inpatient hospital services."  42 U.S.C. § 1395ww(d)(1)(A).  And these costs include "all routine operating costs . . . as such costs are determined on an average per admission or per discharge basis"—a method that necessarily includes both fixed and variable costs.  *Id.* § 1395ww(a)(4).  But as discussed above, DRG payments are prospective; they are not based on a hospital's actual costs, and they are not allocated between fixed and variable costs.  *See*

19

*Appalachian Reg'l Healthcare, Inc. v. Shalala*, 131 F.3d 1050, 1053 (D.C. Cir. 1997).  Indeed, § 1395ww mentions "fixed costs" only in the VDA provision.  And no language in the Medicare Act addresses whether the Secretary can designate a portion of a hospital's DRG revenue as reimbursement for its fixed costs.  Thus, although DRG payments are meant to reimburse hospitals' fixed and variable costs, the Medicare Act does not *command* the Secretary to take any particular approach to those payments in determining whether an eligible SCH or MDH has been fully reimbursed for its fixed costs.

Finally, regardless of whether their proffered methodologies are required by law, the plaintiffs argue that the Secretary's method fails to "fully compensate" them for the fixed costs they actually incurred.  42 U.S.C. § 1395ww(d)(5)(D)(ii).  But the structure of the Medicare Act makes clear that perfect, dollar-for-dollar reimbursement is unnecessary.  Under the Act, the lion's share of each hospital's reimbursement for inpatient care is comprised of DRG payments, which "[are] calculated without regard to a hospital's actual cost" and thus "cannot be easily separated and allocated to particular items or services."  *Appalachian Reg'l*, 131 F.3d at 1053.  There is "inevitable tension" between that prospective system and the assertion that the Act also requires the calculation and reimbursement of actual fixed costs.  *See id.* at 1054.  For that reason, the Court reads section 1395ww(d)(5)(D)(ii) to direct the Secretary to calculate VDA payments in a manner that approximates full compensation for fixed costs, even if perfection— considering the available information—is out of reach.  Whether the Secretary has appropriately exercised that discretion is a classic question for *Chevron* Step Two.

      *ii.*  Step Two

Because the Act does not prescribe a formula to calculate the VDA payment, the Court next considers whether the Secretary's chosen method "is based on a permissible construction of

the statute." *Chevron*, 467 U.S. at 843.  If the Secretary's interpretation is reasonable, the Court "must defer" to it.  *Methodist Hosp.*, 38 F.3d at 1229.  "Step two of *Chevron* does not require the best interpretation, only a reasonable one."  *Am. Forest Paper Ass'n v. FERC*, 550 F.3d 1179, 1183 (D.C. Cir. 2008).  Review at *Chevron* Step Two is "highly deferential," *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 665 (D.C. Cir. 2011) (internal quotation omitted), especially so in Medicare challenges. *Cmty. Care Found. v. Thompson*, 318 F.3d 219, 225 (D.C. Cir. 2003).

The Court agrees with the Eighth Circuit that the Secretary's interpretation is reasonable. *Unity Healthcare*, 918 F.3d at 577.  To the extent that DRG payments pursuant to the prospective payment system are insufficient to cover an eligible hospital's fixed costs for a given year, the Secretary has determined that the VDA will fill that gap.  *See* 82 Fed. Reg. 37,990, 38,180.  This reasonably effectuates the statutory command to "provide for such adjustment to the [DRG payments] as may be necessary to fully compensate the hospital for the fixed costs it incurs in the period."  42 U.S.C. § 1395(d)(5)(D)(iii); *see Unity Healthcare*, 918 F.3d at 577.

Not only is the Secretary not required to isolate the "fixed cost" portion of the DRG payments when calculating the VDA, it was permissible for him not to do so.  As explained above, a DRG payment is calculated separately from the hospital's actual costs and thus "cannot be easily separated and allocated" between fixed and variable costs.  *Appalachian Reg'l*, 131 F.3d at 1053.  The Secretary must navigate between the requirement that the hospital's fixed costs in a given year be fully compensated by its DRG revenue and its VDA, and the fact that its DRG payments are based on average, not actual, costs.  And the Secretary reasonably exercised his discretion to create the calculation method by deciding that the VDA should make up any difference between the prospective payment that the hospital already received and the fixed costs

that it incurred.  This "general resolution of the resulting ambiguity is a permissible interpretation of the statute."  *Id.  See also Unity Healthcare*, 918 F.3d at 577 ("As the Secretary points out, the prospective nature of DRG payments makes it difficult to determine how best to allocate those payments against the actual fixed costs a hospital incurs.").

True, the Board approximated the portion of the DRG revenue attributable to fixed costs by using the hospital's actual fixed vs. variable cost ratio.  But the Board freely admitted that it did "not have the . . . actuarial data to determine a split between fixed and variable costs related to a DRG payment," so it had to use the contractor's "fixed/variable cost percentages as a *proxy*."  *See, e.g.*, AR 69 (emphasis added).  Even this method does not come without flaws.  Take a hospital with an atypically high percentage of variable costs.  Its fixed/variable cost ratio will be applied to its DRG revenue, which is based on an average cost of treatment.  That average might reflect a smaller proportion of variable costs.  The Secretary reasonably decided not to make these estimations, as nothing in the statute describes how to allocate a DRG payment between fixed and variable costs.  He was certainly not required to rely on imperfect data.  *See Anna Jacques Hosp.*, 797 F.3d at 1172.  And even if the Board's method is *superior*, that does not render the Secretary's approach *unreasonable*.  *Id.*

Finally, the fact that the 2017 Final Rule adopted the Board's method on a prospective basis does not show that the Secretary's method is unreasonable.  *See* Pl's Mot. for Summ. J at 35.  "An initial agency interpretation is not instantly carved in stone.  On the contrary, the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (quoting *Chevron*, 467 U.S. at 863–64).  The Department explained that it had received feedback from hospitals and the Board that it would be "more appropriate" under the Act to "compare estimated

22

Medicare revenue for fixed costs to the hospital's fixed costs when determining the [VDA]."  82 Fed. Reg. 37,990, 38,180.  Though it continued to recognize the problem that DRG payments "are not based on an individual hospital's actual costs in a given cost reporting period," it understood why hospitals wanted "CMS [to] make an effort, in some way, to ascertain whether a portion of [DRG] payments can be allocated or attributed to fixed costs."  *Id.*  It was persuaded of the possible benefits of this approach; it did not agree that its then-current method was unreasonable.  *Id.*; *see Anna Jacques Hosp.*, 797 F.3d at 1171.  Nor does the Court.

> ### 2.    *Kisor*

The Court will defer only to a "reasonable" interpretation of a "genuinely ambiguous" regulation.  *Kisor*, 139 S. Ct. at 2415–16.  The interpretation must constitute the agency's "authoritative" or "official" position, and it should implicate its substantive expertise.  *Id.* at 2417.  And the agency's reading must reflect its "fair and considered judgment."  *Id.*  Deference is "rarely" appropriate if the agency's interpretation has been inconsistent over time.  *Id.* at 2418.

The Secretary's interpretation easily passes this test.  The applicable regulation instructs the contractor to "determine[] a lump sum adjustment not to exceed the difference between the hospital's Medicare inpatient operating costs and the hospital's total DRG revenue for inpatient operating costs based on DRG-adjusted prospective payment rates for inpatient operating costs."  42 C.F.R. § 412.92(e)(3); *id.* § 412.108(d)(3).  Then, to decide the adjustment amount, the contractor considers the hospital's "needs and circumstances," its "fixed (and semi-fixed) costs," and "the length of time [it] has experienced a decrease in utilization."  *Id.*  The plaintiffs argue that, per the regulation, the VDA must equal the difference between a hospital's total inpatient operating costs and its total DRG revenue.  Not so.  The regulation merely provides a *ceiling* that

the VDA cannot exceed.  *See Unity Healthcare*, 918 F.3d at 578.  Once that ceiling is

established, the contractor must consider various factors relating to the individual hospital.

      As such, like the statute that it interprets, this regulation does not mandate the use of a

specific formula.  Thus, it is ambiguous, leaving the Secretary with discretion to apply a formula

that complies with the statutory and regulatory requirements.  The Secretary has reasonably

exercised that discretion.  His method ensures that the VDA payment will never exceed the

regulatory ceiling, and it heeds the regulation's directive to focus on factors including the

hospital's fixed (and semi-fixed) costs.[9]

      The Secretary's method, as expressed in numerous formal adjudications, certainly reflects

the Department's official position.  And "deference is all the more warranted" in the context of

this "complex and highly technical regulatory program."  *Thomas Jefferson Univ.*, 512 U.S. at

512.  Moreover, this interpretation is not a "post hoc rationalization" or merely a convenient

litigation position.  *Kisor*, 139 S. Ct. at 2417.  So there is no reason to doubt that it is the product

of "the agency's fair and considered judgment."  *Id.* (internal quotation omitted).

      Finally, the Court again dismisses the argument that the Secretary's calculation method

contradicts the Department's "longstanding interpretation" and is therefore not entitled to

deference.  *See* Pl's Mot. for Summ. J. at 40.  As the Court explains above, the Secretary's

interpretation has been endorsed by final agency decisions going back over a decade, and it is

consistent with past agency guidance.  Thus, the Court will defer.

---

[9] The Administrator explained that the contractor accounted for "the individual hospital's needs and circumstances . . . the hospital's fixed (and semi-fixed) costs . . . and the length of time the hospital has experienced a decrease in utilization."  *See, e.g.*, AR 21.

**CONCLUSION**

For the foregoing reasons, the Secretary's cross-motion for summary judgment is granted, and the plaintiffs' motion for summary judgment is denied. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

September 30, 2021